# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

Michael Adams,                                         Civil No.: 22-cv-465 JRT/DTS

       Plaintiff

vs.

D.S. Erickson, and Associates, PLLC,

       Defendant.

SECOND AMENDED COMPLAINT FOR:

1.  DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. 12101, *ET SEQ*, AS AMENDED;

2.  WHISTLEBLOWER VIOLATION, MINN. STAT. §181.932, *ET SEQ*., AS AMENDED; AND

3.  DISABILITY DISCRIMINATION IN VIOLATION OF MINN. STAT. § 363A.08, *ET SEQ*., AS AMENDED, AND

4.  PUNITIVE DAMAGES

**DEMAND FOR JURY TRIAL**

NATURE OF THE CASE

This is an action brought by Plaintiff Michael Adams, a United States citizen and resident of the state of Minnesota (herein after "Adams" or "Plaintiff") against D.S. Erickson and Associates, PLLC, a Minnesota Limited Liability Company,)

1

doing business in Minnesota (hereinafter "D.S. Erickson," "Erickson," or "Defendant").

JURISDICTION

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, [Federal Question], under statutory authority and 28 U.S.C. §1367(a), Supplemental Jurisdiction, of this Court. The matter in controversy exceeds, $75,000 exclusive of interest.  Further, this suit is brought and jurisdiction lies pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.,* as amended.

2.     The Court has jurisdiction over claims arising under Minnesota state law pursuant to its pendent jurisdiction and 28 U.S.C. §1367(a). The claims arising under Minnesota state law Minn. Stat. § 181.932, *et seq*, as amended and Minn. Stat. § 363A.08, *et seq.*, as amended.  The claims arising under State and Federal law arise from the same case or controversy, and have a common nucleus of operative fact.

VENUE

3.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b)(1)-(2). Michael Adams resides in the State of Minnesota. A substantial part of the wrongs alleged herein were committed within Hennepin County, Minnesota, which is within the District of Minnesota.

PERSONAL JURISDICTION

4.     D.S. Erickson and Associates, PLLC, is a Minnesota Limited Liability

Company, doing business within the State of Minnesota and elsewhere. Its registered office address is 7650 Edinborough Way, Suite 500, in the City of Edina, Hennepin County, State of Minnesota.   Defendant does business throughout Minnesota including Hennepin County. Defendant's principal office address is 7650 Edinborough Way, Suite 500, in the City of Edina, Hennepin County, State of Minnesota.

THE PARTIES

PLAINTIFF

MICHAEL ADAMS

5.      Michael Adams (hereinafter known as "Adams," or "Plaintiff") is a disabled male who is a United States citizen and a resident of the State of Minnesota, County of Scott, City of Prior Lake. He is a natural person.  All conditions precedent to jurisdiction have been complied with to wit: Plaintiff filed a joint charge with the EEOC and the MHRD on July 7, 2021.  He was given a right to sue on November 23, 2021. All conditions to starting the instant complaint have been completed.  He filed the instant lawsuit within 90 days of November 23, 2021.

DEFENDANT

D.S. ERICKSON AND ASSOCIATES, PLLC

6.      Defendant D.S. Erickson and Associates, PLLC, (hereinafter "Erickson," or "Defendant") is a Minnesota Limited Liability Company, doing

3

business in Minnesota doing at 7650 Edinborough Way, Suite 500, in the City of Edina, County of Hennepin in the State of Minnesota. Erickson's principal office address and its registered office address is 7650 Edinborough Way, Suite 500, Edina, MN 55435.

Nature of the Case

7.      This is an action brought by Plaintiff Michael Adams, a United States citizen and resident of the County of Scott in the State of Minnesota.  He was employed by Defendant from July of 2017 to November 22, 2021. Plaintiff is currently unemployed, having been constructively terminated by Defendant on November 22, 2021.

Procedural Posture

8.      Plaintiff is a male person who is a citizen of the United States and the State of Minnesota and resides at 4131 Eau Claire Trail NE, Prior Lake, MN.  The unlawful employment practices, discrimination, harassment, and retaliation alleged herein were committed within the state of Minnesota.  Defendant is a Minnesota Limited Liability Company authorized to do business in and currently doing business in the state of Minnesota.  It also does business in other states and is a business that affects interstate commerce and employs more than 20 employees.

9.      Plaintiff experienced discrimination, harassment, and retaliation while employed by Defendant.  He timely filed a Charge of Discrimination with the EEOC

which was cross filed with the Minnesota Human Rights Department.

## GENERAL ALLEGATIONS

10.    Plaintiff brings claims for discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as amended, violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932, *et seq.,* as amended, and violation of the Minnesota Human Rights Act, Minn. Stat. §363A.8, *et seq.*, as amended.

11.    The Federal court has jurisdiction based on the Plaintiff's claim for violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101, *et seq.*, as amended.

12.    The Federal Court also has pendant and/or supplementary jurisdiction over the claims of whistleblowing in violation of the Minnesota Whistleblower Act, Minn. Stat. § 189.932, there are allegations of repeated and continuous violations of federal law by Defendant including FDCPA, FCRA, HIPAA and 45 C.F.R. § 160.316. Defendant's business involves interstate commerce, and disability discrimination in violation of Minn. Stat. § 363A.08, *et seq*., as amended.

13.    The matter in controversy exceeds, (exclusive of interest and costs) the sum of seventy-five thousand dollars ($75,000.00).

## INTRODUCTION

14.    Plaintiff was induced by Defendant to work for it by promises made by

its owner Dale Scott Erickson (hereinafter referred to as "Dale Erickson" or Dale Scott Erickson"). Before offering Plaintiff a job, Defendant knew that Plaintiff had no training or experience as a paralegal. Dale Scott Erickson, Defendant's owner represented himself to Plaintiff as an expert on federal law. He promised to give Plaintiff the title of paralegal and extensively train him on federal law dealing with debt collection and HIPAA to do the job of a paralegal. Erickson represented that his firm has a history of thoroughly training its paralegals on federal and state law. Further, Defendant promised to train Plaintiff to do all bill collecting according to legal standards and abide by business associate agreements between Defendant and the medical organizations that had hired it. Defendant represented that his business specialized in debt collection and strictly followed all laws and ethical considerations so that it was a great place to learn how to be a paralegal. Dale Scott Erickson further promised that his business supplied a fair nondiscriminatory and lawful playing field. As consideration for taking the job, in addition to monetary compensation based on commission, Defendant offered extensive training on federal law related to debt collection, HIPAA, legal training to be a paralegal, and help advancing his career as a paralegal.

15.    The foregoing promises were consideration offered by Defendant to Plaintiff. In return Plaintiff, as consideration, was to take the job as a paralegal and do collection work for Defendant.

16.     Plaintiff was not knowledgeable about all aspects of business and law and the Defendant orally emphasized to Plaintiff how Defendant's training to be a paralegal and the title would enhance Plaintiff's career and earning potential.

17.     Defendant promised that Plaintiff as a fulltime paralegal would be paid a generous commission that would grow exponentially with time. Plaintiff was promised to be able to earn a strong living and encouraged by Defendant's promise to help him secure as many jobs working on debt collection as possible.

18.     Plaintiff was induced by Defendants promises and relied upon them in deciding to take the job with Defendant and began working for Defendant on or about July 20, 2017.

19.     Defendant preyed upon Plaintiff's lack of knowledge to exploit Adams to use as an instrument to make money using unethical and illegal practices that are a basis for this complaint. Defendant did not provide the promised training, but instead tried to use Plaintiff to do things Mike Adams in good faith suspected were unethical and in violation of the law.

20.     Subsequently, Defendant did not honor its promise to teach Plaintiff the law, how to be an excellent paralegal, abide by the law, honor the alleged business associate agreement and supply a fair nondiscriminatory/lawful playing field and the ability to earn an increasingly larger income.

21.     After Plaintiff started to work at Defendant in 2017 he observed what

he believed in good faith were illegal acts by his employer that continued through the time he was constructively terminated in the fall of 2021.

22.   While working for Erickson, Plaintiff Adams observed firsthand what he in good faith suspected were violations of law by Defendant.

23.   D.S. Erickson illegally collected private, privileged medical information that patients' believed was completely confidential between the patient and his/her medical provider. Defendant obtained, transmitted and/or received more patient information than is necessary for the intended task of collecting an outstanding medical bill. Erickson illegally `used such information as a means to enhance its bill collecting efforts.

24.   Adams in good faith resisted and reported suspected violations of law.

25.   Plaintiff in good faith made reports to Defendant of suspected illegal acts by it. His understanding, per Erickson handbook, is that Dale Scott Erickson served the roles of President/CEO of the firm, Owner of the firm, Lead Attorney of the firm, Human Resources Manager of the firm, as well as other roles, but perhaps most importantly, Chief Compliance Officer of the firm.

26.   Starting in January of 2021 he in good faith resisted and reported illegal acts by his employer.

27.   Adams's supervisor Dale Scott Erickson tried to cut him off when he was making reports of violations of law and evaded the subject.

28.     At a meeting in January 25, 2021, Plaintiff Adams orally in good faith reported to Dale Scott Erickson suspected violation of law regarding the collection of debt. Plaintiff specifically in good faith reported violations of HIPAA's minimum necessary rule. Subsequently there were other good faith reports on June 4, June 11, June 25 and August 3, 2021.

29.     Defendant responded by retaliating against Plaintiff including overly scrutinizing him, cutting off the flow of business to Mike Adams, making him look bad in front of coworkers, belittling him, making a false accusation. Defendant made clear through its attitude, activities and acts, that it was trying to forced Plaintiff out of his job.

30.     The extremely hostile work environment created by Defendant including discrimination, harassment and retaliation as well as breaching its promises to Plaintiff caused Plaintiff damage including loss of income, mental and emotional distress and a constructive termination of Plaintiff job by his being forced to resign. As a result of the unlawful acts, treatment, discrimination, and retaliation and harassment by Defendant the Plaintiff was severally damaged.

**FACTS**

31.     Defendant knew at the time of offering the Plaintiff a position of paralegal that his previous job of 10 years, before being recruited to work for the Defendant, did not consist of work related to the FDCPA (Fair Debt Collections

Practices Act) or HIPAA (Health Insurance Portability and Accountability Act), which are the major components that Defendant promised the firm faithfully obeyed and he was to be trained on. These are both federal laws designed to protect consumers from abusive collection practices and to provide medical patient's privacy.

32.    Plaintiff accepted the job with Defendant in 2017 based on the promises by Defendant including it supplying a fair nondiscriminatory/lawful playing field where Plaintiff would receive extensive training on federal law related to collection, HIPAA legal training to be a paralegal, help advancing his career as a paralegal, a commission increasingly yielding higher returns to Plaintiff. He was further promised training on the Federal law and state law, that Defendant faithfully followed at FDPCA and HIPAA laws, teaching him to be an excellent paralegal, enhancing his career path, working full time get exponentially greater commissions, teaching him to fulfill all requirements of business associate agreements between Defendant and its clients.

33.    Dale Scott Erickson the owner of Defendant who is a lawyer represented that he was an expert on federal law related to the collection of debt and promised to mentor Plaintiff as a paralegal. Mr. Erickson talked about the need to abide by business associate agreements that Defendant had with its medical organizations and how Defendant would teach Plaintiff to do work that was

consistent with these agreements and the law included with them.

34.    Defendant's owner Dale Scott Erickson promised Plaintiff that he could rely on the firm's policy manual to set forth exactly what the firm does in dealing with its business and that it was being provided to Plaintiff as part of Defendants promise to train him.

35.    Plaintiff was induced to take Defendant's offer of employment relying on the promises made to him by Defendant. Plaintiff took the offered job and performed everything he was to do.

36.    As Plaintiff worked for Defendant, he began to suspect there were contradictions in the firm's policy manual and how it operated. This made him extremely uncomfortable because if the manual stated something must be done according to law and the firm was instructing him to do otherwise than he was not getting proper training and was being told to violate the law.

37.    The firm's policy manual stated that any debts that are credit reported and subsequently disputed by patients must be reported to the respective client, so that the credit report may reflect accordingly to honor the FCRA and FDCPA. This practice was not followed, contrary to the Policy and Procedure manual and the law. Plaintiff in good faith reported it was illegal. Instead of Defendant meeting with Plaintiff to discuss why what the firm was doing was different than the manual the Defendant retaliated against him. This was an act of retaliation by Defendant.

38.    The firm's policy manual stated that cellular phones are not to be placed on workstations or desktops at the firm. Employees regularly utilized their cell phones at their desk, contrary to the Policy and Procedure Manual.

39.    The firm's policy manual stated that the firm does not accept post-dated checks unless requested by a customer. It further stated the checks must be kept on file at the front desk. This policy also stated that the consumer must be notified not more than ten and not less than three business days before the deposit of each post-dated check. Recurring credit card charges must be agreed to by the consumer in writing and a copy of the signed agreement must be provided to the consumer. This policy also states the proper letter of notice will be sent by legal administrators. The Plaintiff observed that Defendant solicited post-dated checks. The checks were not kept on file at the front desk. Customers were not notified by administration staff in writing regarding deposit of their postdated check. Credit card charges were not confirmed in writing, but rather orally. These were all acts in contradiction to the Policy and Procedure Manual and the federal law as Plaintiff understood it.

40.    Defendant did not contrary to its promise meet and train Plaintiff but instead send inconsistent messaging such as the foregoing of having a policy and procedure manual say one thing and have employees do something different that Plaintiff in good faith suspected was a violation of law.

41.    The firm's policy manual stated there were to be privacy screens on

firm monitors, so that the PHI cannot be viewed by anyone in close proximity, including those that are not handling the matter. This was not the case. Further, there were not adequate workstation time-outs, limiting PHI exposures on unattended monitors, as is suggested in the manual.

42.     Defendant broke its promises to Plaintiff. It violated federal and state law causing damages to Plaintiff while he worked for it as a paralegal/bill collector from 2017 to 2021.

43.     While employed by Defendant Plaintiff regularly handled unpaid bills to certain hospital or medical organizations.  He did this for approximately four years.   There was common access to the names of hospitals and medical organizations that were represented by D.S. Erickson within and without it and they were not treated as though they were secret.

44.     The names of these hospitals and/or medical organizations that were clients of Defendant are embedded in Plaintiff's memory.  The work atmosphere at D.S. Erickson was very loose and the names of both the hospitals and medical organizations and the people who allegedly owed them money was talked about openly and freely.

45.     There was no discussion about keeping clients such as hospitals and/or medical organizations confidential.  To the contrary, there was discussion of various lawsuits by customers such as medical organizations that were in lawsuits and

publicly disclosed so there was no secret about the entities that D.S. Erickson represented.

46.     For example, information about entities represented by Defendant are readily available to the public from business directories and the like.  D.S. Erickson did not treat their customer names or even litigation involving them as a secret to be protected.

47.     The customer names set forth in this Amended complaint are ones that Plaintiff was involved with during the time he worked for Defendant and were commonly known and used by him on a day to day basis.

48.     The names of clients of Defendant stated in this Amended complaint are easily remembered by Plaintiff and easily ascertainable to the public.

49.     These clients of Defendant can be independently compiled from non-confidential sources outside the Defendant's business and are not protected.  For example, the relationship between Defendant and its clients stated in this complaint that are published on the internet, for example, a search of the Minnesota Public Access to Case Records for open cases in which Dale Scott Erickson is the attorney of record produces a seven and a half page document listing 200 open cases where the plaintiff is a hospital and/or clinic and Dale Scott Erickson is the attorney of record for the plaintiff.  The listing of plaintiffs includes Mayo Clinic, Mayo Clinic Health System, Fairview Health Services, MCHS Fairmont, North Memorial

Ambulance, Ridgeview Medical Center, and many others. *See,* Exhibit A, filed as ECF Doc. 4-1 and incorporated herein by reference.

50.   As plaintiff learned more about the Defendant's business, he in good faith suspected Defendant violated federal law, state law, committed fraud, did not abide by the business associate agreements, and failed to follow its own manual. Defendant violated federal laws including FDPCA, HIPAA and the FCRA as well as Minnesota law on fraud.

51.   While at work Plaintiff learned that in addition to the business associate agreements Defendant had also allegedly signed a contract with the attorney general in Minnesota. From what Plaintiff observed he suspected that Defendant breached these agreements. These business associate agreements involved matters that were known to effect Plaintiff and the performance of his job.

52.   Dale Scott Erickson gave instructions to Plaintiff that he suspected violated the business associate agreements as well as FDCPA, HIPAA and the FCRA were at times acts of fraud.

53.   Defendant allegedly made business associate agreements with Medical entities such as the Mayo Clinic, Fairview, Allina, North Memorial, and Ridgeview that required it to honor federal regulations and laws.

54.   Defendant D.S. Erickson allegedly made a promise as part of the foregoing business agreements to obey the FDCPA and HIPAA including the

requirement of only using information on a need to know basis, which formed a contract.

55.  Despite federal laws on collection that Plaintiff was learning about on his own he began to suspect that Defendant expected him to do acts contrary to the law and the alleged business associate agreements Defendant had with the Mayo Clinic, Fairview, Allina and Ridgeview.

56.  Defendant allowed confidential information covered in the foregoing contracts to be unsecured so anyone who came into the office or had access to the computer could get the information. It did not honor a need to know in dealing with confidential information. Employees of Defendant took computers with the confidential information home where others could see it. The way Defendant had the computers set up anyone could access patients private information that had nothing to do with collecting bills, which was way beyond a paralegal/bill collector such as Plaintiff would have a "need to know" basis.

57.  Defendant breached its promise to follow the FDCPA, FCRA and HIPAA the need to know doctrine by among other things communicating or allowing the dissemination of private patient information. These violations including disclosures to parties without a need to know were a breach of promise and related duty by Defendant. By doing so if was foreseeable and in fact did happen that Plaintiff saw as a third-party information and without a need to know private patient

information that he should not have been exposed to under HIPAA.

58.     As a result of this unauthorized disclosure which was a breach Plaintiff was harmed because he in good faith resisted the Defendants suspected violation of its contractual duty and duty to obey regulations including the FDCPA and HIPAA and reported in good faith the suspected violations of law by Defendant. This was also a breach of contract by Defendant of the Business Associate Agreements that detail all the responsibilities to contract with business such as Mayo Clinic, Fairview, Allina and Ridgeview as well as the promises made by Defendant to Plaintiff.

59.     Further, Plaintiff in good faith suspected the Defendant committed fraud by among other things giving instructions to make illusory audits to mislead clients, which was state fraud.

60.     Working for Defendant the Plaintiff was forced by the failure of Defendant to obey the rules set forth in HIPAA to see various private information that he suspected in good faith violated the law. This involved Plaintiff knowing information that he should not have been exposed to but for Defendants suspected violation of law. Adams in good faith whistle blew to stop this damage to the public and in turn was retaliated against by Defendant causing him property damage by causing Plaintiff to lose income and be shut out of future financial growth with Defendant.

61.     Defendants disclosure of sensitive personal information which was

done by Defendant harmed the Plaintiff because he was being instructed to do acts by Defendant that were contrary to federal law, violations of privacy and the alleged business associate agreements.

62.   The Plaintiff reported in good faith to Erickson suspected violations of law to his supervisor Dale Erickson in 2021. These whistleblowing reports included fraud, unethical and illegal activity in violation of 45 C.F.R. § 160.36, 45 C.F.R. § 164.502, 45 C.F.R.§ 164.502 (b) (1), Fair Debt Collection Practices Act, 15 U.S.C. § 1692e, 12 C.F.R. § 1005.10 (() (1) and other laws as well by Erickson.

63.   On June 4th 2021, Plaintiff in writing reported to Erickson a list of acts that Erickson's firm had committed, which he believed were illegal. Defendant disingenuously responded to that email on June 8th, 2021, only to indicate that Erickson disagreed with his report, that Dale Scott Erickson believed that his firm was compliant with the law in all respects, and that Erickson had retained outside counsel to review the report he had made, as it relates to Erickson firm's policies and procedures. This response, in which Erickson denied all reports he had made, was the only time that he heard back from Erickson regarding any of the multiple illegal violations he reported verbally on January 25, 2021; and in writing on June 4, 2021 (Exhibit B), June 11, 2021 (Exhibit C), June 25, 2021 (Exhibit D), and August 3, 2021 (Exhibit E), filed as ECF Doc. 4-2, 4-3, respectively and incorporated herein by reference.

64.     In another act of good faith to do right by the public, despite the risk of further retaliation from Erickson, Adams emailed Erickson an additional whistleblowing report of what he believed to be illegal acts on June 11th, 2021, further elaborating on previous reports, as well as additional beliefs of illegal acts and violations of law. He also elaborated on the retaliatory acts that Erickson had executed against him as a result of his whistleblowing:

The following are additional reports not included in the June 4, 2021, report.

June 11, 2021:     Cutting off telephone referrals as unlawful retaliation;

Using log-in interchangeably in violation of 164.312(d)

Violating Florida Criminal Law by not announcing the call is recorded (34.03(2)(d),

Violating California law by not announcing the call is recorded, California Penal Code §632

Violation of copyright law

65.     Despite Adams oral report and multiple written reports, in an attempt to drive necessary compliance and adherence to the law by the Erickson firm, Plaintiff received no acknowledgement of these reports of illegal activity. Instead, Erickson attempted to dissuade Adams by not responding and instead retaliating against him.

66.     Plaintiff in good faith believed it was the right thing to do to ferret out

the illegal acts that Erickson willfully was doing that were harmful to the public.

67.    Defendant ignored properly addressing Plaintiff's whistleblowing reports in 2021. Instead, Erickson attempted to intimidate Adams and stagnate his ability to earn an income by figuratively starving him on the vine. Erickson prohibited Mike Adams from having the same opportunities as his colleagues, which he had been afforded before he whistleblew.

68.    Adams had clearly articulated in whistleblowing reports made in good faith to Erickson in 2021 the fraudulent connotations of mislabeling bill collectors as paralegals, despite the inadequate or absence of training and/or supervision to validate such a title. Again, Erickson did not acknowledge or respond to this report, yet Adams noticed that employees, with exception of attorneys at Erickson firm, had removed the signature line in any recent email correspondence. This corroborates the validity of a whistleblowing report that Adams made to Erickson on June 4th, 2021.

69.    Defendant did business in various states other than Minnesota. Defendant in good faith had the understanding that some of the places Defendant was working in may have required people doing bill collecting to have licenses. Given that he reported his concern with the information and/or lack of proper training given to bill collectors. He on the one hand in the past had been led to believe that bill collectors had to be licensed in some states while on the other hand he

observed that may not have been the case at Erickson's firm where it practiced in different states where the licensing requirement may be in effect. In good faith he reported the legal concern about bill collectors possibly being required to be licensed to recover money. Rather than Erickson explaining how the law may impact the situation to his employee Adams he ignored the concern leaving Adams again without guidance from his employer.

70.    Defendant failed to give prompt remedial action to addressing the questions, concerns and whistleblowing reports Plaintiff made in 2021.

71.    Another suspected illegal activity in good faith reported by Adams in 2021 was his good faith belief that under Minn. Stat. § 332.37 it is illegal to collect any money from a debtor that is not fully reported to a creditor and to fail to return any amount of overpayment from a debtor to the debtor or to the State of Minnesota pursuant to the requirements of Chapter 345.

72.    Adams often observed via the daily payment reports that there were overage payments that post to the firm, when the excess funds should instead be returned to the customer. These overage payments are straight commission for Erickson employees, because they are not being applied to a customer's bill. This again Plaintiff in good faith reported to Erickson was illegal.

73.    On June 21st 2021, when Adams accessed Fairview's Epic system, there was a warning in their system advising that patients must be reminded of the

risks with non-encrypted emails and texts to be intercepted/accessed by others. This confirmed yet another whistleblowing report, which Adams had made to Erickson on June 25th, 2021, was also true and correct.

74.    Plaintiff also observed what he in good faith suspected was a failure to act legally in handling customer disputes. When a customer disputes a bill to Erickson firm, Plaintiff believed it should not impact their credit until validation of the debt can be provided to the customer by law. For many of Erickson clients, Adams observed they were unable to acquire validation of the debt within a reasonable timeframe. Not alerting Erickson clients, so that the customer's credit report can denote such a dispute has taken place, Plaintiff in good faith believed was false and misleading and could have dire implications to a customer that is trying to clean up their credit.

75.    Plaintiff in good faith believed Erickson was obligated to ensure transparency under the Fair Credit Reporting Act, as it relates to a dispute being properly documented, so that the customer isn't damaged as a result.

76.    Throughout the year of 2021 Plaintiff continued to in good faith resist what he suspected were illegal acts and report in good faith suspected violations of law to Defendant, including January 25, 2021, June 4, 2021, June 11, 2021, June 25, 2021 and August 3, 2021. *See,* Exhibits B, C, D, and E, filed as ECF Docs. 4-2, 4-3, 4-4 and 4-5, respectively and incorporated herein by reference.

77.     Defendant's reaction to the aforementioned reports was to take action against Plaintiff in 2021 likely to dissuade a reasonable employee from engaging in ethical and legal practices and discourage proper activity. Defendant's action against Plaintiff for resisting and reporting illegal acts was retaliation including for acting legally and ethically in making reports to his supervisor of suspected violations of law, resisting participating in illegal and unethical acts.

78.     Plaintiff was never trained in HIPAA, except for how to redact statements, when they are submitted to an opposing attorney or the courts to look good. The lack of training in Federal Laws which are far reaching and cover many subjects, which are complicated was a problem. Extensive training was needed to effectively understand what they encompass.

79.     Because Plaintiff wanted to do his job properly and was not receiving the training promised and needed, he tried to research topics on his own. Not being a lawyer or even a trained paralegal this was especially difficult. In doing his research he often found that it raised suspicion in his mind that Defendant was acting illegally and/or unethically.

80.     Plaintiff in good faith over time started to suspect that Defendant fraudulently calls bill collectors paralegals, despite not providing them the necessary training needed to justify the title. If they were in fact paralegals, then Plaintiff in good faith believed Defendant Dale Scott Erickson would be

responsible for the work they perform and any respective violations of law, from what he read on his own pursuant to Minnesota Rule of Professional Responsibility 5.5 mentioned above. This is also stated in the policy and procedures manual.

81.     Defendant's repeated failure to honor its promises to Plaintiff brought on severe anxiety and depression. It was extremely distressing for Plaintiff to believe in good faith that he was working for a law firm that refused to acknowledge its illegal practices and correct them.

82.     Up until Plaintiff began making his good faith reports on suspected violations of law, Plaintiff had never received a formal warning in the four (4) years he worked for Defendant because there was never a reason to question his performance.

83.     In 2021, after Plaintiff began making his good faith whistleblowing reports about Defendant's suspected violations of law, Defendant began retaliating against Plaintiff by trying to set him up for failure and cut down on his ability to earn a living so he would quit or there would be a pretextual reason for firing him.

84.     Before Plaintiff whistle blew in January of 2021 Defendant had repeatedly recognized Plaintiff as a strong performer. In May of 2020 Defendant recognized Plaintiff for getting the job done and performing better than ever.

85.     In November of 2020, two months prior to Plaintiff's January 2021

whistleblowing report, Dale Scott Erickson called and thanked Plaintiff for his hard work, for being a team player, and for collecting more money, more consistently, than during the last three and a half years. Erickson was so happy with how well Plaintiff was doing for the firm that he provided him with a raise.

86.    Plaintiff suspected based on the foregoing that Defendants true measure of performance is based on how much money the employees collect, not if they are compliant with the law on how the money is collected.

87.    During 2021, Plaintiff continued to whistleblow on the activities that Plaintiff in good faith suspected were illegal and at the same time address the discrimination, harassment and retaliation to which he was being subjected by Defendant.

88.    Plaintiff increasingly in 2021 began to discover more suspected violations of law by Defendant and reported them to Dale Scott Erickson the owner of Defendant. In response the Defendant cut him out of the information stream so as to make Plaintiff's job difficult if not impossible; and made his work atmosphere so hostile that it forced him to resign.

DISABILITY DISCRIMINATION

89.    D.S. Erickson & Associates knew since July of 2017 that Plaintiff has ulcerative colitis. It is a chronic inflammatory autoimmune disease.

90.    In March 2020, Plaintiff was diagnosed as having borderline diabetes

as well as rheumatoid arthritis, which is also a chronic autoimmune disease and promptly notified Defendant of this additional disability.

91.    In March of 2020 Plaintiff informed Defendant that his health conditions/disabilities lowered his resistance to illness and especially put him at greater risk of contracting COVID-19 and potentially severe complications as a result.

92.    On March 29th, 2021, Plaintiff met with his doctor.

93.    The purpose of the meeting was to discuss his concern with work related stress causing either or both of his auto-immune diseases to go out of remission as well as new symptoms that he was experiencing, including but not limited to his eyes twitching, loss of appetite, loss of sleep due to nightmares, and loss of sleep due to night sweats. Plaintiff also was suffering from panic attacks during the day.

94.    Because of Plaintiff's ulcerative colitis he does not have a colon. Stress at work exacerbated his symptoms causing extreme bathroom urgency and frequent loose stools, and although this was known to Defendant, Dale Scott Erickson looked down on Plaintiff, failed to provide adequate accommodations and retaliated against Plaintiff's need for such accommodations, thereby adding to Plaintiff's stress and further exacerbating his physical conditions.

95.    The workplace stress due to Defendant's discrimination, harassment and retaliation caused Plaintiff to experience nighttime incontinence, sexual

dysfunction, lack of interest or desire to engage in activities that he had formerly enjoyed, feelings of worthlessness and depression.

96.     The stress caused by Defendant complicated Adams' ulcerative colitis and rheumatoid arthritis causing aches and pains, as well as debilitating stress-headaches and fatigue.

97.     The exacerbation of Plaintiff's symptoms was clearly the treatment he was receiving from Defendant.

98.     Plaintiff met with his rheumatologist on or about April 2, 2021, and again on May 11, 2021, to discuss the aches and pains he had been dealing with the past several weeks. The specialty doctor determined these symptoms were the result of his work-related stress, which was also causing the insomnia. He ordered a prescription for the insomnia he had been experiencing and said that a medical leave from his job would be beneficial to allow him time to heal.

99.     In response to Defendant's inquiry as to when Plaintiff would return to the office[1] Plaintiff emailed Dale Scott Erickson on March 22, 2021, letting him know he would know more the following week after his doctor's appointment. Defendant didn't respond. This was a pattern of discriminatory conduct by Defendant. He would do a retaliatory act and then after Plaintiff responded the Defendant would not reply.

---

[1] Three to four other employees were still working from home at this time.

100.   Plaintiff's medical provider prescribed him medications to help with these symptoms and thought it'd be best that he take a leave of absence from work, so he could try to heal, which Plaintiff did from April 6 to May 20, 2021.

101.   After Plaintiff in good faith reported to Defendant a suspected violation of law the owner Dale Scott Erickson acted in such a way to get back at Plaintiff knowing that he was highly vulnerable based on his medical condition. One of these ways was requiring him to unnecessarily come into the office when he was ill which was discriminatory and retaliatory.

102.   The owner of Defendant had even gone so far to damage Plaintiff in January of 2021 by removing Plaintiff's access to business so as to offset the raise he had given Plaintiff in November.

103.   Defendant unnecessarily asked Plaintiff to change his work location by requiring Plaintiff to come into the office so that it could further retaliate by threatening and intimidating him in person. This is true because Defendant had previously expressed in writing that anyone with health conditions (Dale Scott Erickson the owner of Defendant knew Plaintiff had and will always have two immuno-compromised diseases) would be allowed to work from home indefinitely. Plaintiff took Defendant at its word and relied on it, but Defendant did not keep his promise.

104.   Another act of unlawful discrimination, harassment and retaliation

was that at a firm email Erickson falsely made a comment that the hoped the Plaintiff would come to a meeting on compliance when he knew that Plaintiff was too sick to do so and that meetings in the past had titles on them that had nothing to do with obeying the law or compliance. This was to falsely make it look like Plaintiff was not willing to come to a compliance meeting to use against him when the reality is that it was the Plaintiff was the one that had in good faith reported suspected violations and the Defendant had failed to take prompt remedial action to correct the illegal and/or unethical activity in which it had engaged.

105.   While Plaintiff was on leave Defendant indicated resources would be assigned to manage Plaintiff's workload while he was out. When he was cleared to resume working, Plaintiff then tried to log in to the system to begin working and was unable to do so because the firm did not have sufficient licensing for the software, which he in good faith reported as a probable violation of the Copyright Act. Plaintiff spent 3 full business days without the necessary support, to fix the firm's licensing violation, so he could resume working. He felt further ostracized and abandoned, not being afforded basic access to perform the essential functions of his job. This was another demonstration of the firm's retaliation toward him, in perpetuating his sicknesses and diminishing his ability to make an income, in an effort to force Plaintiff to quit.

106.   When Plaintiff was finally able to access the system to resume

working, he quickly realized the support the firm had provided was more harm than help. He had 25 voicemails waiting for him, along with over 300-time reminders requiring him to review accounts, multiple spreadsheets to review the same accounts, and more inventory to work through than before his medical leave. Plaintiff found that in his absence Defendant missed deadlines, payments were missed, accounts that were worked weren't documented and they weren't pushed into the future, causing Plaintiff to review the account(s) again and judgements had expired. This left Plaintiff with over a month's worth of work to catch up on in addition to doing the current work that was required. Plaintiff's income while he was on leave dropped by half and he made far less up through the termination of his employment.

ONGOING DISCRIMINATION BASED ON DISABILITY

107.   Defendant discriminated against Plaintiff because of his disabilities. Dale Scott Erickson knew about Plaintiff's disabilities. He knowingly and intentionally discriminated against Plaintiff's out of disability discrimination putting Plaintiff's health and welfare in danger.

108.   Plaintiff's disabilities are physical impairments that substantially limits one or more of his major life activities. He could however, do his job very well, but Erickson has used Adams's disabilities against him in such a way as to negatively impact Adams's terms, conditions and privileges of employment.

109.   Plaintiff has a disability known to Defendant that substantially limits one or more major life activities. There was a record of such impairment and he was regarded as having that impairment.

110.   Plaintiff as a disabled person was qualified to do his job and perform the essential functions of the job either with or without reasonable accommodations. The requested accommodation was to be able to work out of his home as promised, which he had been earlier able to do and was granted to other workers who did not even have a disability.

111.   When the Plaintiff brought up his disability it was used against him and has been a source that Scott Erickson has used to mock and retaliate against Plaintiff.

112.   Dale Erickson made it clear that he did not want to grant reasonable accommodations for the Plaintiff's disability but instead he has used Plaintiff's disability as an instrument when needed to destroy his credibility and make it falsely look bad for him in a particular situation. Adams's disability has been used against him by Dale Erickson. He knew that he was good at his job and that he is qualified for the position he held from 2017 to constructive discharge and able to perform its essential functions, with or without a reasonable accommodation.

113.   Defendant employer Dale Scott Erickson had contempt for Plaintiff because of his disabilities. He did things against Plaintiff did that were harmful to

him medically without giving a valid reason for the Defendants adverse employment actions against him.

114.   Plaintiff was discriminated against on the basis of his disabilities of ulcerative colitis, rheumatoid arthritis, borderline diabetes, his immune compromised state and COVID-19. Despite Defendant knowing of his medical conditions the employer expected him to return to the office knowing people did not wear masks, there was no vaccine requirement and a lack of social distancing. The conditions in the office were dangerous to Plaintiff especially because of his known underlying conditions that placed him at greater risk to contract a severe case of COVID-19).

115.   Despite Defendant knowing about Plaintiff's vulnerable condition it failed honor the reasonable accommodations and in fact made efforts to do things that it knew would harm him medically as well as retaliating against him in violation of the Americans with Disability Act including for his having filed a charge of discrimination against his employer.

116.   On March 20, 2020, Defendant had already emailed staff that they could work from home.

117.   When a co-worker at Defendant saw Plaintiff wearing a mask he ridiculed Plaintiff for wearing it. On March 25, 2020, Governor Walz issued the stay at home order. Some of Plaintiff's colleagues were already working from

home. Because the company no longer had an HR department, on or about March 26, 2020, Plaintiff spoke with his boss Dale Scott Erickson who is also an owner of Defendant and asked to be allowed to work from home because of his underlying health conditions. Erickson responded in a loud, angry, exasperated sounding voice, if you want to go home, go home, in front of numerous co-workers. Plaintiff did not take his response as permission to work from home. The next day Plaintiff brought in a note from his doctor, but his boss refused to take it, said he didn't need it. *See*, Adams Exhibit F, filed as ECF Doc. 4-6 and incorporated herein by reference. From that point Plaintiff understood that he was allowed to work at home and began working from home. Despite his health conditions, he was able to perform the essential functions of his job duties with or without accommodations.

118.   Although Plaintiff's employer eventually allowed him to work from home it was a grudging response. Dale Scott Erickson downplayed the seriousness of the pandemic and COVID-19 on many occasions. He voiced the opinion that it was nothing more than a bad case of flu, that there was really no danger, that a person couldn't live in a bubble, and that people should just get it (preferably not at the workplace) and get over it like with the flu instead of trying to avoid catching COVID-19. Erickson also told Plaintiff that he did not have to worry about COVID complications because he was young and healthy, despite knowing of

Plaintiff's disabilities to make Plaintiff feel foolish and weak, completely ignoring the fact that Plaintiff's underlying conditions made him extremely vulnerable to COVID-19 complications.

119.   On March 28, 2020, Plaintiff began working from home. Although he was allowed to work from home, the reality was that he immediately began to notice that he was getting fewer and fewer calls from which he could potentially draw commissions. This continued throughout the time that Plaintiff worked from home resulting in his income stagnating. Plaintiff could see from the daily reports that his colleagues' income was increasing. He was made to feel that he was some sort of pariah by both his boss and co-workers. His boss Dale Scott Erickson contacted him during the time he was working from home. He continued to downplay the virus wanted to know when Plaintiff would be back in the office despite knowing the Plaintiff's disability made him dangerously vulnerable. Communication with the office was a problem as no one would answer Plaintiff's calls. Plaintiff's numbers continued to stagnate because new cases were not being directed to him.

120.   The normal function of the office allegedly was supposed to be that administrative employees answered the incoming telephone calls and then directed them to the paralegals/debt collectors. This was often not the case with Plaintiff who had a known disability. He was not able to improve his numbers because he

was not being referred incoming telephone calls. Plaintiff's boss falsely out of discrimination accused Plaintiff of allegedly stealing incoming telephone calls and then told Plaintiff that he was not to answer incoming telephone calls any longer unless it was before 9 AM and after 4 PM. Plaintiff also had his new business removed completely for 30 days allegedly so he could work on the cases that were in his que; which ultimately turned into 6 months.

121.   In March of 2021, Dale Scott Erickson started asking if Plaintiff had been vaccinated and when he would be back in the office disregarding Plaintiff's disabilities making him dangerously vulnerable. From the beginning Plaintiff had asked for a reasonable accommodation and although he was allowed to work from home, his employer did everything he could to discriminatorily sabotage and undermine him so that he could not be effective in his job.

122.   The treatment that Plaintiff received from his boss has been tremendously damaging to him physically, mentally and emotionally. He had to go out on a leave of absence because of the stress, physical health, and his mental and emotional health due to the discriminatory, harassing and retaliating damaging conduct of Defendant.

123.   After Plaintiff brought an EEOC/MHRA charge against his employer D.S. Erickson and Associates PLLC, his employer escalated the discrimination, harassment and retaliation against him. The employer used various pretextual

devices to try and either get Plaintiff to quit or have a phony reason for firing Plaintiff. One of the later tactics was to create a situation where Plaintiff had to choose between going into work where it is life endangering to him or have his employer falsely claim that he could not do the job. This was a terrible manipulation of reality because he had already discussed his medical conditions, multiple health problems as can be documented and the employer knew about these problems for years, but only after Plaintiff's resistance and reporting of suspected illegal acts by Plaintiff in 2021 during the COVID pandemic did the employer push using them as a device to utilize to force Plaintiff out of his job.

124.   Plaintiff received a letter from the Mayo Clinic "recommend[ing] that moderately or severely immunocompromised people receive an additional dose of mRNA COVID19 vaccine" and advising him that "[he is] in this group of people eligible for an additional COVID-19 vaccine shot due to either a health condition or medications [he is] taking that suppress [his] immune system and having already received two doses of mRNA vaccine." COVID *See*, Adams Exhibit G, filed as ECF Doc. 4-7 and incorporated herein by reference. Moreover, Plaintiff's employer also got the attached letter from Mike Adams' rheumatologist stating that his going into work could be fatal. *See*, Adams Exhibit H, filed as ECF Doc. 4-8 and incorporated herein by reference. His employer also got, through his agent, a letter from a Doctor of Nursing Practice about Plaintiff's multiple, serious health

36

conditions that raised Adams' level of risk for extremely serious complications if he contracted COVID-19 to near the highest level, if not the highest level. *See*, Adams Exhibit I, filed as ECF Doc. 4-9 and incorporated herein by reference. *See also*, Adams Exhibit J, filed as ECF Doc. 4-10 and incorporated herein by reference.

125. After getting this information the employer, through his lawyer, came up with yet another pretextual discriminatory and retaliatory device of saying, in effect that Plaintiff needed to show when he would be getting off his prescribed medications that lower his immunity because he had to be in the office to be supervised. *See*, Adams Exhibit K, filed as ECF Doc. 4-11 and incorporated herein by reference. This was a discriminatory device because for more than a year Plaintiff had not been required to be in the office to do his work, nor is there any need for him to be in the office. Plaintiff's employer even issued a letter earlier saying that if someone had a disability they could work out of his or her home indefinitely.

126. Plaintiff's health conditions were known by Defendant not to be going to change so the Defendant knew that he would not be getting off of the prescriptions, thus the new pretextual efforts to force Plaintiff into the office, which was known he should not and could not do, was an outrageous act of discrimination, harassment and retaliation. Plaintiff was able to do his job, but was

advised by his doctor's not to work in the office where people were not required to be vaccinated, employees did not wear masks, there was no mask requirement and no social distancing so that he could be infected by COVID-19, which could cause very serious complications. The foregoing are acts consistent with the terrible acts of discrimination, harassment and retaliation that went on since Plaintiff resisted and reported in good faith suspected violations of law.

127. Plaintiff's disabilities are physical impairments that substantially limit one or more of his major life activities. He could however, do his job very well, but Defendant used Adams's disabilities against him in such a way as to negatively impact Adams's terms, conditions and privileges of employment.

128. Plaintiff's disabilities of rheumatoid arthritis and ulcerative colitis substantially limits one or more major life activities. There was a record of such impairment and he was regarded as having that impairment.

129. Adams as a disabled person was qualified to do his job and perform the essential functions of the job either with or without reasonable accommodations. These requested accommodations were to be able to work at home, get the same referrals both in quality and quantity as when he was in the office, and not be made fun of or treated differently and more negatively because of his disabilities.

130. He asked more than once for reasonable accommodations but met

resistance by Defendant. In fact, Defendant withdrew his earlier promise to allow Plaintiff to work out of his home since there was no need for him to come into the office to do his job. Despite the previous promise Defendant went back on its promise and discriminatorily demanded Plaintiff work in the office despite the fact that others had been able to work at home doing the same type of work as Plaintiff and that he had successfully worked out of his home with no complaint from Defendant until Plaintiff began resisting and reporting suspected violations of law on the part of the Defendant. In fact, during the time Plaintiff worked out of his home his work was so good that he received a raise from his employer in recognition of this fact.

131.   Throughout the time Plaintiff worked for Defendant he suspected that the employer set about a course to conceal its violations of federal law and fraud by masking it with statements about its owner's expertise and that its activities had been based on expert advice of a major Minneapolis law firm. Plaintiff relied upon the representation that the owner of Defendant was an expert in the law on collections and had the support and advice of a leading firm in the area of collection law. Further, Defendant's owner bragged about his connections and power in the legal community and that his complete operation was independently audited by a major Minneapolis law firm, which Plaintiff later learned was the same law firm that had represented Defendant in litigation against it in court.

132.   Mike Adams having tried to familiarize himself with the law became concerned that Defendant was using its own lawyers the law firm that represented Defendant on allegations of wrong doing while claiming that the same law firm independently audited Defendant and had found it had done nothing wrong. This raised a good faith suspicion in the Plaintiff's mind that there was a conflict of interest in having the same law firm supposedly advising Defendant on the law, defending Defendant in law suits against it for breaking the same type of law it had advised it on and claiming it was independently auditing Defendant and certifying that it found Defendant had been doing everything right..

133.   In the spring and summer of 2021 Plaintiff due to the discrimination, harassment and retaliation Defendant felt very ill and reported it to Defendant. He had disabilities that were comorbidities that placed him in great danger if exposed to COVID. Plaintiff was aware of this danger and provided letters from doctors explaining the danger to him in returning to the workplace instead of continuing to work at home

134.   Defendant had his counsel from the same law firm Erickson claimed did independent objective audits have a lawyer from that firm deal with Plaintiff related to his disability. A letter from Defendant demanded recertification of his disability from every one of his doctors that was understood was based on the advice of the lawyer from firm that represented Defendant and who was supposed

to a neutral objective auditor. *See*, Adams Exhibit L, filed as ECF Doc. 4-12 and incorporated herein by reference. The demand for recertification was contrary to law pursuant to the ADA. The second letter was directly from lawyer acknowledging receipt of Plaintiff's doctors' notes and wanting to know when he would be discontinuing his medicine, while at the same time knowing that the medicine had to be permanently taken based on his chronic disabilities. *See*, Exhibit K filed as ECF Doc. 4-11 and incorporated herein by reference.

135.   Defendant and the lawyer's contacts raised deep concerns with suspected violations of anti-discrimination laws by Defendant and its agents. The lawyer who had earlier received a letter from his doctor and knew about his conditions and the danger of his having to do his work in a public space, yet tried to compel him to do things in violation of the ADA.

136.   Defendant and its alleged independent counsel set up an impossible situation for Plaintiff where if he returned to do his work at the Defendant's offices where people did not wear masks, there was no vaccination for COVID-19 required, inadequate ventilation and no required social distancing he could get seriously ill, if not die or, if he did not return to the workplace, lose his job. This was also despite Defendant and the lawyer knowing he had been successfully working at home and could do the job with or without accommodations. There was no valid reason why he should have had to work out of the office except for Defendant wanting

41

discriminatorily force him out of his job. The letter from the lawyer on behalf of Defendant was a pretextual device to force Plaintiff out of his job.

137.   Plaintiff was put under tremendous stress in 2021 due to the foregoing acts and activities of Defendant. The pains he felt in his stomach were substantial. In December of 2021 Plaintiff scheduled an appointment with a medical provider who did scans that revealed Plaintiff had ulcers, at least one of which was bleeding. Before Defendant set about discriminating, harassing and retaliating against him the Plaintiff had never experienced the foregoing symptoms that indicated the he was suffering from the ulcers.

138.   The work related stress caused by Defendant that Plaintiff was forced to endure exacerbated his gastrointestinal problems including leakage of bowel/intestinal fluids into the peritoneum resulting in Plaintiff needing to undergo further surgery to correct the problem.

139.   When the Plaintiff brought up his disability it was used against him and has been a source that Scott Erickson used to mock and retaliate against Plaintiff.

140.   Dale Erickson used Plaintiff's disability as an instrument when needed to destroy Plaintiff's credibility and make it falsely look bad for him in a particular situation. Adams's disability has been used against him by Dale Erickson. He knew that he was good at his job and that he is qualified for the position he held from 2017 to the date of his constructive discharge and able to perform its essential functions,

with or without a reasonable accommodation.

141.   In the late summer to early fall of 2021 Plaintiff again went through these disability problems with Erickson that were documented. He provided letters from the Mayo clinic showing that because of his disabilities he was highly vulnerable to complications from COVID if he were to become infected with the disease. Moreover, his employer also received a letter from his rheumatologist stating that his going into work could be fatal. His employer also got through his agent a letter from a Doctor of Nursing Practice with many years of experience detailing information related to his disabilities. After getting this information the employer came up through his lawyer with the phony device earlier stated herein of saying in effect that Adams needed to show when he was getting off of the medicine that lowered his immunity because he had to be in the office to be supervised. This was obviously a trick because for more than a year he had not had to be in the office to do his work nor is there any need for him to be in the office. Further, it was known by his employer that his disability is permanent and that he would not be getting off of the medicine and that he could do his job.

142.   Despite knowing that the Plaintiff is qualified and able to do the job his employer discriminated against him. Erickson's conduct in 2021 shows that Plaintiff was being subjected to a negative job action based on disability. Other employees who did not have a disability were treated differently and better than Plaintiff. They were

not required to work in the office nor subject to the limitation to earn a living that was put on Plaintiff. If they had a question or concern, they were not humiliated and/or penalized like the Plaintiff has been.

143.   Over 2021 Erickson made the Plaintiff feel that his job security, assignments, conditions of employment, work privileges, ability to earn a living with Erickson was dependent on his putting up with Defendant's disability discrimination and that because of it he had to yield to Dale Scott Erickson's unreasonable and damaging demands or lose his job.

144.   After Plaintiff filed his EEOC charge Defendant set about a course to force Plaintiff to get too sick to handle the job, be set up for failure so he could be fired or quit. Plaintiff talked with several doctors who were clear that he could not abide by the Defendant's unreasonable demands.

145.   Plaintiff tried more than once in 2021 to discuss with Dale Scott Erickson his disability and honor reasonable accommodations he was requesting but Erickson the owner of Defendant was not interested and would not even accept a letter from his doctor.

146.   Plaintiff continued throughout 2021 to observe Defendant Erickson do acts that were suspected to be illegal.

147.   In the instant case, the employment relationship between Plaintiff and Defendant Erickson required a greater obligation to refrain from inflicting mental or

emotional distress than would apply to a relationship between strangers. That same employment relationship provided to Defendant the knowledge and information about Plaintiff's personal life and physical condition that enabled him to intentionally do harm to Plaintiff.

148.    Erickson's retaliatory conduct toward Plaintiff was extreme and intolerable and was intentionally done knowing it would upset, cause pain and suffering, and damage to the Plaintiff.

149.    Defendant Erickson from 2020 into 2021, intentionally subjected Plaintiff to a discriminatory, unwholesome, hostile, and abusive work environment, insults, shunning, unjustified criticism, destruction of his professional reputation and related harassment were pervasive, and the law was violated by Erickson. Plaintiff was made to feel as though he was a misfit and not economically viable. Erickson intentionally and with malice did acts directed at Plaintiff that caused him severe physical, mental and emotional distress, pain and suffering.

150.    The negative effects of Defendant's intentional infliction of mental distress have taken a terrible toll upon Plaintiff. This toll has become increasingly worse. Plaintiff has developed deep depression, anxiety and Post Traumatic Stress Disorder and severe ulcers that will likely require surgical intervention to repair. He has bad feelings about himself; he has become embarrassed and self-conscious about his disabilities; he is frequently tired with very little energy and has found difficulty

going to sleep and staying asleep. He finds that in addition to his other sleeping problems that when he does go to sleep, on some occasions, he ends up getting too much sleep; he feels down and depressed every day and experiences no pleasure in doing things that normally had been enjoyable for him. In addition to the foregoing he is experiencing headaches; anxiety; distressing dreams; deep depression; flashbacks; panic attacks; feeling fidgety; fatigued; ulcers, feeling worthlessness and guilt even though he has done nothing wrong when he feels ill.

151.   Plaintiff was forced to work in a hostile work environment where discrimination, harassment and retaliation were ever present. Defendant's owner, Dale Scott Erickson, continuously carried on a campaign of discrimination, harassment and retaliation against Plaintiff. The illegal acts that were repeated and continuous by Defendant forced Plaintiff to resign which was a wrongful constructive termination by Erickson. Defendant's foregoing acts of discrimination, harassment and retaliation have caused Plaintiff severe damage.

152.   Mike Adams was subjected to intolerable working conditions by Defendant. The intolerable conditions were created by Defendant with the intent of forcing Plaintiff to quit and/or Plaintiff's resignation was reasonably foreseeable to Defendant. D.S. Erickson was given a reasonable opportunity to remedy the problem, and it would have been illegal for the Defendant to overtly terminate Plaintiff especially since he had whistleblowing in writing and filed an EEOC charge, which

is why the employer used these covert methods to get the employee to quit.

FIRST CAUSE OF ACTION

DISCRIMINATION BASED UPON DISABILITY
IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)
42 U.S.C. § SECTION 12101, *ET SEQ.*, AS AMENDED

153.   The foregoing is alleged and incorporated in this paragraph by reference as though fully set forth herein.

154.   Under the ADA, it is unlawful for an employer to discriminate against a qualified individual with a disability. Additionally, an employer must make reasonable accommodation(s) to the known physical or mental limitations of an employee who is a qualified individual with a disability.

155.   Plaintiff has a disability which substantially limits one or more of his major life activities, has a record of such an impairment, and is regarded as having such an impairment.

156.   The nature and severity of the impairment is rheumatoid arthritis and ulcerative colitis (with colon removed), which makes and/or effects mobility, digestion of food, elimination of waste making frequent trips to restroom necessary as well as a compromised immune system. The duration or expected duration of the impairment is for the remainder of his life time. These are permanent disabilities and have long term impacts of or resulting from the impairment.

157.   Plaintiff was a qualified individual with a disability who, with or without

47

reasonable accommodation, was able to perform the essential functions of the position in question without endangering the health and safety of the individual or others.

158. Plaintiff meets the experience or education requirements of the job given to him at Defendant.

159. Plaintiff was treated differently than were other employees who were able to work at home. Plaintiff was temporarily allowed to work from home, but the employer placed restrictions on what Plaintiff was allowed to do and when he was allowed to do it, such as taking incoming calls, which Defendant refused to let Plaintiff do. Defendant further denied Plaintiff being assigned new accounts, even though other employees working from home were allowed new accounts. Thus, while Plaintiff was theoretically "working from home" the reality was that restrictions placed upon him while working from home denied Plaintiff the same opportunities as other employees who were allowed to work from home.

160. Plaintiff Michael Adams was employed by DS Erickson & Associates since July of 2017, as a paralegal/bill collector doing collection work. Defendant has more than 15 employees.

161. Since his late teens Plaintiff has had ulcerative colitis. It is an autoimmune disease and a chronic inflammatory disease. In March 2020, he was diagnosed as having borderline diabetes as well as rheumatoid arthritis, which is also a chronic  autoimmune disease all of which are recognized disabilities and were

known to Defendant.

162.  Plaintiff's disabilities of Ulcerative Colitis and Rheumatoid Arthritis and pre-diabetes are physical impairments that substantially limits one or more of his major life activities. A record of such impairment exists and Defendant knew about his disabilities.

163.  Plaintiff was qualified for his job and could perform the essential functions of the job either with or without reasonable accommodations.

164.  Plaintiff could do his job very well, but Defendant discriminatorily used Adams's disabilities against him in such a way as to negatively impact Adams's terms, conditions and privileges of employment

165.  Plaintiff's health conditions lowered his resistance to illness. It especially put him at greater risk of contracting a severe case of COVID-19.

166.  Dale Scott Erickson the owner of Defendant was aware of Plaintiff's underlying health conditions.

167.  Plaintiff was discriminated against on the basis of his disabilities of ulcerative colitis, rheumatoid arthritis, borderline diabetes and COVID-19. Despite Defendant knowing of his medical condition the employer expected him to return to the office knowing people did not wear masks, there was no vaccine requirement, poor ventilation and a lack of social distancing. The conditions in the office were dangerous to Plaintiff especially because of his known underlying conditions that placed him at

greater risk for serious complications were he to contract COVID-19.

168.   Despite Defendant knowing about Plaintiff's vulnerable condition it failed to give him reasonable accommodations and in fact made efforts to do things that it knew would harm him medically as well as retaliating against him in violation of the Americans with Disability Act.

169.   On March 20, 2020 Defendant sent out an e-mail to all staff acknowledging that he had already granted accommodations to employees without known disabilities to work at home.

170.   When a co-worker at Defendant saw Plaintiff wearing a mask, he ridiculed Plaintiff for wearing it. On March 25, 2020, Governor Walz issued the stay at home order. Some of Plaintiff's colleagues were already working from home. Because the company no longer had an HR department, on or about March 26, 2020, Plaintiff spoke with his boss Dale Scott Erickson who is also an owner of Defendant and asked to be allowed to work from home because of his underlying health conditions. Defendant responded in a loud, angry, exasperated sounding voice, if you want to go home, go home, in front of numerous co-workers. Plaintiff did not take his response as permission to work from home. Like his peers, Defendant's response shows his discrimination by letting others who were not disabled work at home on March 20, 2020, but getting angry with Plaintiff who had a disability that gave a basis for working at home only six (6) days later which is illustrative of Defendant's

discriminatory attitude that was repeated and continuous over the period of 300 days preceding Plaintiff's filing of the EEOC. There was a pattern and practice of discrimination based on disability against Plaintiff by Defendant.

171.   On or about March 27, 2020, Plaintiff brought in a note from his doctor, but his boss refused to take it saying he didn't need it. From that point Plaintiff understood that he was allowed to work at home and began working from home on March 28, 2020. Despite his health conditions, he was able to perform the essential functions of his job duties with or without accommodations, as acknowledged by Defendant.

172.   Although Plaintiff's boss allowed him to work from home it was a grudging response. Dale Scott Erickson downplayed the seriousness of the pandemic and COVID-19 on many occasions. He claimed it was nothing more than a bad case of flu, that there was really no danger, that we couldn't live in a bubble, and that people should just get it (preferably not at the workplace) and get over it like with the flu instead of trying to avoid catching COVID-19. Dale Scott Erickson also told Plaintiff that he did not have to worry about COVID complications because he was young and healthy like it was no big deal, to make him feel foolish and weak, despite knowing Plaintiff's underlying conditions made him extremely vulnerable to COVID-19 complications.

173.   On March 28, 2020, Plaintiff began working from home. Although he

was allowed to work from home, the reality was that he immediately began to notice that he was getting fewer and fewer calls. This continued throughout the time that Plaintiff worked from home resulting in his income stagnating. Plaintiff could see from the daily reports that his colleagues' income was increasing. He was made to feel that he was some sort of pariah by both his boss and co-workers. Dale Scott Erickson contacted him during the time he was working from home, downplaying the virus, pushing for when Plaintiff would be back in the office. Communication with the office was a problem as no one would answer Plaintiff's telephone calls. Plaintiff's numbers continued to stagnate because new cases were not being directed to him.

174.   The normal function of the office allegedly was supposed to be that administrative employees answered the telephone calls and then directed them to the paralegals/debt collectors; this was often not the case with Plaintiff who had a known disability. He was not able to improve his numbers because he was not being referred telephone calls. Plaintiff's boss falsely out of discrimination accused Plaintiff of allegedly stealing telephone calls and then told Plaintiff that he was not to answer telephone calls any longer unless it was before 9 AM and after 4 PM. Plaintiff was also taken off all telephone calls for 30 days allegedly so he could work on the cases that were in his que; this turned into six (6) months.

175.   In March of 2021, Dale Scott Erickson started asking if Plaintiff had been vaccinated and when he would be back in the office. From the beginning Plaintiff had

asked for a reasonable accommodation and although he was grudgingly allowed to work from home, his employer did everything he could to sabotage and undermine him so that he could not be effective in his job.

176.   The treatment that Plaintiff received from Defendant tremendously damaged him physically, mentally and emotionally. He had to go out on a leave of absence because of the damage to physical health and mental and emotional health wellbeing due to the discriminatory, harassing and retaliating conduct of Defendant.

177.   After Plaintiff brought an EEOC/MHRA charge against his employer D.S. Erickson and Associates PLLC, his employer escalated the discrimination, harassment and retaliation against him. The employer used various pretextual devices to try and either get Plaintiff to quit or have a phony reason for firing him. One of the later tactics was to create an impossible situation where Plaintiff had to choose between going into work where it is life endangering to him or have his employer falsely claim that he could not do the job. This was a terrible manipulation of reality because he had multiple health problems as can be documented and the employer knew about these problems for years, but only after his disability being brought up by Plaintiff in 2021 during the COVID pandemic did the employer push using them as a device to utilize to force Plaintiff out of job.

178.   Plaintiff received a letter from the Mayo Clinic "recommend[ing] that moderately or severely immunocompromised people receive an additional dose of

mRNA COVID19 vaccine" and advising him that "[he is] in this group of people eligible for an additional COVID-19 vaccine shot due to either a health condition or medications [he is] taking that suppress [his] immune system and having already received two doses of mRNA vaccine." *See*, Adams Exhibit G, filed as ECF Doc. 4-7 and incorporated herein by reference. Plaintiff's employer also was provided a letter from his rheumatologist stating that going into work could be fatal. *See*, Adams Exhibit H, filed as ECF Doc. 4-8 and incorporated herein by reference. Defendant was also provided a letter from a Doctor of Nursing Practice about Plaintiff's multiple, serious health conditions that raised Adams' level of risk for extremely serious complications if he contracted COVID-19 to near the highest level, if not the highest level. *See*, Adams Exhibits I and J, filed as ECF Docs. 4-9 and 4-10, respectively and incorporated herein by reference.

179.   Plaintiff asked more than once for reasonable accommodations but was not honored by Defendant. In fact, Defendant contradicted his earlier promise to allow Plaintiff to work out of his home despite there being no need for him to come into the office to do his job. Defendant went back on its promise and demanded Plaintiff work in the office knowing other employees had been able to work at home doing the same type of work as Plaintiff and that he had successfully worked out of his home with no complaint from Defendant. During the time Plaintiff worked out of his home his work was so good that he received from his employer recognition of this fact.

180.   When the Plaintiff brought up his disability it was used against him and has been a source that Defendant has used to mock and retaliate against Plaintiff.

181.   Defendant made it clear that no reasonable accommodation would be honored by Erickson for the Plaintiff's disability but instead used as an instrument when needed to destroy his credibility and make it falsely look bad for him in a particular situation. Adams's disability has been used against him by Defendant. It knew that he was good at his job and that he is qualified for the position he held from 2017 to discharge and able to perform its essential functions, with or without a reasonable accommodation.

182.   After Plaintiff filed a charge jointly with the EEOC and the Minnesota Human Rights Department, Defendant engaged in acts of reprisal. Adams' employer escalated the discrimination, harassment, and retaliation against plaintiff. The employer used various pretextual devices to try and either get plaintiff to quit or have a pretextual reason for firing him. One of the tactics was to create a situation where Plaintiff had to choose between going into work which was life endangering to him or have his employer falsely claim that he could not do the job. This was a terrible manipulation of reality because he had multiple health problems that were well documented. The Employer knew about these problems for years, but after the filing of the EEOC charge defendant escalated efforts by it to force plaintiff out of his job.

183.   Defendant sent a letter that required Plaintiff to get letters from all his

doctors, which was contrary to what Plaintiff believed was the law. D.S. Erickson further had his lawyer send another letter saying that she had to be notified when Plaintiff was going discontinue his immune compromising prescriptions prescribed for his disabilities despite knowing that Plaintiff had a permanent disabilities that required he remain on these medicines. This was a continuance of the tactic used to put the Plaintiff in an impossible position where he either returned to work facing serious health danger, get fired, or quit.

184.   Plaintiff talked with more than one doctor who were clear that he could not abide by the Defendant's unreasonable demands. Defendant created intolerable working conditions with the intent to force Plaintiff to resign. The Defendant by its actions constructively terminated Plaintiff.

185.   The foregoing disability discrimination by Erickson was in violation of the ADA and was the direct and proximate cause of damage to Plaintiff in excess of $75,000.

SECOND CAUSE OF ACTION

AGAINST DEFENDANT ERICKSON FOR RETALIATION
FOR WHISTLEBLOWING IN VIOLATION OF THE
MINNESOTA WHISTLEBLOWER ACT, MINN. STAT. §181.932, *ET SEQ*., AS AMENDED

186.   Plaintiff repeats and repleads and incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

187.   The Minnesota Whistleblower Act, Minn. Stat. § 181.932, et seq., as

amended states in pertinent part:

Minnesota Statute § 181.932 Disclosure of information by employees.

Subdivision 1. Prohibited action. An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1)   the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

(2)   the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;

(3)   the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason;

(4)   the employee, in good faith, reports a situation in which the quality of health care services provided by a health care

facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm;

(5)    a public employee communicates the findings of a scientific or technical study that the employee, in good faith, believes to be truthful and accurate, including reports to a governmental body or law enforcement official; or

(6)    an employee in the classified service of state government communicates information that the employee, in good faith, believes to be truthful and accurate, and that relates to state

(i)    a legislator or the legislative auditor; or

(ii)    a constitutional officer.

The disclosures protected pursuant to this section do not authorize the disclosure of data otherwise protected by law.

188.    Plaintiff while employed by Defendant was engaged in interstate commerce. Defendant Erickson has two or more employees engaged in interstate commerce.

189.    Defendant Erickson has an annual gross volume of sale made or business done in excess of $500,000.

190. Plaintiff was to be paid by a wage which was a commission based on the amount of debt he collected and not on a salary basis.

191. Plaintiff had been employed by Erickson from 2017 to the date of his constructive discharge on November 22, 2021. Defendant has approximately 35 employees.

192. Defendant is responsible for Dale Erickson's treatment of Adams under respondeat superior.

193. In January of 2021 Plaintiff had worked for Erickson approximately three and a half (3.5) years.

194. Plaintiff whistle blew more than once about suspected violations of law to his supervisor Dale Erickson in 2021. June 4, 2021, June 11, 2021—similar report as June 4, 2021 report except for addition of restricting ability to answer telephones as a form of retaliation (by restricting telephone access, Defendant was cutting opportunities for Plaintiff to increase his income); Using log-in interchangeably in violation of 164.312(d);   Violating Florida Criminal Law by not stating the call is recorded (34.03(2)(d); Violating California law by not stating the call is recorded, California Penal Code §632; and Violation of copyright law; June 25, 2021 report not validating debt in a reasonable time frame and not updating credit reports on disputed debt in violation of the Fair Credit Reporting Act (FCRA); and August 3, 2021, must report suspected breaches of HIPAA to hospitals 45 C.F.R. § 164.410.

195.   As a result of the aforementioned whistleblowing reports of Defendant's suspected violations of law, it retaliated against Plaintiff with respect to the rights, privileges, terms and conditions of Plaintiff's employment, threatened him, and ultimately through its retaliation caused a constructive discharge of Plaintiff.

196.   Plaintiff's whistleblowing reports covered more than one type of illegality. The majority of his whistleblowing reports covered good faith suspicions by him of Defendant violating federal laws, including FDCPA, the FCRA and HIPAA.

197.   Federal law 45 C.F.R. § 160.316 sets forth that a covered entity or business associate, such as Defendant, may not threaten, intimidate, coerce, harass, discriminate against, or take any other retaliatory action against any individual or other person for filing a complaint or Opposing any act or practice made unlawful by this subchapter, provided the individual or person has a good faith belief that the practice opposed is unlawful, and the manner of opposition is reasonable and does not involve a disclosure of protected health information in violation of subpart E of part 164 of this subchapter.

198.   After Plaintiff started to work at Defendant in 2017 he observed what he believed in good faith were illegal acts by his employer that continued through the time he was constructively terminated in the fall of 2021.

199.   Article III of the United States Constitution gives the federal courts the

power to hear cases involved with violations of federal law. Defendant violated federal and in doing so damaged the public.

200.   Congress by its acts decided that a violation of the statute constituted an injury in fact because Congress enacted HIPAA apart to "curb invasions of individual privacy." The defendant by his violations of HIPAA and thereby gives Plaintiff a right to an action for the damage he received from Defendant's violations of HIPAA. Further, the federal court should have jurisdiction over this matter because it involves violations of federal law. Likewise HIPAA is a federal law and under Article III of the Constitution the federal court has jurisdiction to hear plaintiff's claims of damages related to defendant's violation of federal law.

201.   In January of 2021 Plaintiff made a good faith report of suspected violations of law involving The Minimum Necessary requirements of HIPAA being broadcast to individuals that did not have a need to know, to Dale Erickson. The owner of the firm Dale Scott Erickson responded by retaliation.

202.   By Erickson's acts it showed that he did not want to properly audit and stop illegal activity but instead coverup and protect its conspiracy with Dale Erickson to commit illegal acts.

203.   After the report Erickson retaliated against Plaintiff to keep control over him so he would feel helpless in addressing his deep stated concerns about illegal conduct. The retaliation included insults, threats, unfair working conditions and

cutting off Plaintiff's ability to earn commissions.

204.   Plaintiff in good faith whistle blew a number of times beginning January of 2021.

205.   On January 25th of 2021, Adams reported to Dale Erickson, violations he believed pertained to the Minimum Necessary Rule of HIPAA by Defendant. This report involved providing unnecessary Private Health Information to individuals at Erickson that did not have a need to know, nor were they involved in the work. The Privacy Rule protects all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information "Protected Health Information" (PHI). A business associate, such as D.S. Erickson and Associates PLLC, may only aggregate the PHI for the healthcare operations of the covered entity, not for the business associate's own purposes as stated at 45 C.F.R. § 164.501. According to the Minimum Necessary requirements under HIPAA, this protected information must be de-identified before it can be legally provided to those that are not involved in the work. A common acceptable practice would be redacting the private information, so it is not visible to those who do not have a need to know, which was not done. This unnecessary and illegal exposure was still available through Plaintiff's last day of employment at D.S. Erickson and Associates PLLC on November 22, 2021. Further, this exposure was illegally repeated on a daily basis and

consists of hundreds of patient's information being divulged every day to people not involved in the work and who have no reason to be privy to the protected information. This is a violation of The Minimum Necessary Requirement of the Privacy Rule under 45 C.F.R. § 164.506. as well as 45 C.F.R. § 164.501 and 45 C.F.R. § 164.502(b)(1).

206.   Pursuant to 45 C.F.R. 160.103 – DS Erickson and Associates PLLC is a Business Associate.

207.   45 C.F.R. § 164.314(a)(2) states that Business Associates, such as D.S. Erickson and Associates, are directly obligated to comply with the Security Rule of HIPAA.

208.   Pursuant to 45 C.F.R. § 164.308(a)(1) of the Security Rule, Business Associates must conduct and document a Risk Analysis of their computers and other information systems to identify potential security risks and respond accordingly. This Risk Analysis should be conducted by an information security professional.

209.   Plaintiff reported this suspected violation of 45 C.F.R. §164.308(a)(1) on June 4th 2021 to Dale Erickson. In a later discussion which occurred September 27th, 2021 Adams spoke with the firm's IT Director Karl Kulp. During this conversation the IT director admitted to Adams that the firm's email containing PHI and personal banking information is not encrypted, as Adams had previously reported. Additionally, he admitted that malware can be imbedded in PDF documents and other attachments that the firm transmits daily. He also admitted that he did not recall

instructing Adams to connect to the firm's network using an unknown channel, of which Mr. Kulp was not familiar or aware, despite Plaintiff's reports to Dale Erickson on the same. Mr. Kulp cited potential risks associated. Additionally, Mr. Kulp claimed he did not know that the firm laptop issued to Adams did not have a firewall, which Plaintiff had also reported to Dale Erickson months prior. Had the firm conducted and documented a risk analysis as required, it would be virtually impossible to miss such rudimentary staples as not having a firewall, not encrypting protected documents, or not controlling and/or limiting access to the network and/or secure and prevent access to protected physical documents in the office. These good faith reported violations by Plaintiff and acknowledgement of the same reports by the firm's IT director confirm Plaintiff's reports and known violations by Defendant in not analyzing risk and vulnerabilities required by HIPAA, which compromises patient's Protected Healthcare Information, Personally Identifiable Information, Personal Banking Information, and other sensitive materials which require safeguarding pursuant to federal law.

210.    June 4th, 2021 Plaintiff reported to Dale Erickson believed violations of The Administrative Safeguards of the HIPAA Security Rule at 45 C.F.R. § 164.308(a)(1)(ii)(A), which requires Business Associates, such as D.S. Erickson, to conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic Protected Health

Information held by the Business Associate.

211.   June 4th, 2021 Plaintiff reported to Dale Erickson believed violations of the Administrative Safeguards of the HIPAA Security Rule. Plaintiff reported sheets of information containing Protected Healthcare Information being passed around the office and not being safely kept. Per 45 C.F.R. § 164.308(a)(1)(ii)(B), the Business Associate is to implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level to comply with § 164.306(a)

212.   DS Erickson and Associates failed to provide adequate training to employees regarding HIPAA. The Security Rule 45 C.F.R. § 164.308(a)(5) states Business Associates are required to train their workforce concerning the HIPAA rules to comply with the business associate agreement and HIPAA regulations. Adams has reported that he was never able to see or discuss any of the firm's business associate agreements for any of its clients. Additionally, Adams was never trained on HIPAA during his four-year tenure of employment. None of his peers to his knowledge, have ever been trained on HIPAA either, as is required. These calculated omissions were intended to hide the illegal acts, which clearly violate the Security Rule and Plaintiff reported same to Dale Erickson June 4th, 2021.

213.   In making the above whistleblowing report, Adams considered that the foregoing report also includes connected matters. Business Associates must maintain documents required by the Security Rule for six years from the document's last

effective date per 45 C.F.R. § 164.316(a)(2). Since required training regarding the Security Rule was not conducted, the required retention of documentation by the same rule would easily corroborate no training was ever provided or be an additional violation in itself.

214. Defendant never set forth rules that clearly stated what the paralegal/debt collectors and lawyers could or could not do under the law, contrary to the Minnesota Rules of Professional Conduct 5.1 and 5.3.

215. Plaintiff after doing his own research in good faith reported to Dale Scott Erickson that he suspected that not supervising the work of paralegals whom don't possess adequate training to justify the title is also a violation of Rule 5.3 of the Minnesota Rules of Professional conduct regarding non-lawyer assistants. Rule 5.3 states: With respect to a nonlawyer employed or retained by or associated with a lawyer: a lawyer shall be responsible for the conduct of a nonlawyer that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

216. June 4th, 2021 Plaintiff reported to Dale Erickson that no actual legal training had been provided to employees, in order to justify the title of paralegal,

which D.S Erickson had labeled them as. Giving a misleading title is a type of fraud. It's also a deceptive practice per the Fair Debt Collection Practices Act (FDCPA). False or misleading statements violate 15 U.S. Code § 1692e. A debt collector must not use any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer, such as unjustly claiming to be a trained paralegal.

217.   Despite multiple whistleblowing reports by Adams, DS Erickson and Associates failed to implement safeguards to ensure confidentiality, integrity and availability of PHI to the Minimum Necessary, pursuant to HIPAA law. Privacy Rule 45 C.F.R. § 164.502(b)(1) states that even where disclosure is allowed, business associates must generally limit their requests for use or disclosure of PHI to the minimum necessary for the intended purpose. For example, allowing unrestricted access to systems which provide a patient's race, ethnicity, religion, photo of a patient, or other coveted Protected Healthcare Information of a patient is not necessary to collect the bill. Further, having access to medical testing, diagnosis and treatment of patients unrelated to collection of the bill for which access may be allowed, is another violation of the Minimum Necessary requirement. Therefore, not limiting the access to this information, which is not required for the intended task related to payment for that care, is a clear violation of the Privacy Rule.

218.   June 4th, 2021 Plaintiff reported to Dale Erickson a violation of Minn.

Stat. § 144.293, which is to prevent the release of or disclosure of health records. Plaintiff reported that D.S. Erickson is not a healthcare provider, nor is the collection of past due balances for the current treatment of patients. The information shared, related to patient's diagnosis, condition, testing, treatment and/or prognosis, which is not necessary information to collect a past due bill.

219.   Plaintiff reported to Dale Erickson June 4th, 2021 D.S. Erickson's failure to maintain and monitor PHI access logs contrary to Technical Safeguards requirements at 45 C.F.R. § 164.312(a)(1). This standard requires the entity to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights as specified in § 164.308(a)(4).

220.   Plaintiff reported to Dale Erickson June 4th, 2021 D.S. Erickson's failure to maintain and monitor PHI access logs, which requires the entity to implement policies and procedures to protect electronic protected health information from improper alteration or destruction, pursuant to the Technical Safeguard requirements at 45 C.F.R. § 164.312(c)(1)

221.   The Privacy Rule protects all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this

information "Protected Healthcare Information". Additionally, per 45 C.F.R. § 160.103 Individually Identifiable Health Information is information, including demographic data that relates to . . . the past, present, or future payment for the provision of healthcare to the individual, and that identifies the individual or for which there is a reasonable basis to believe can be used to identify the individual. Plaintiff reported this violation June 4th, 2021 as it relates to the illegal disclosures in the firm's daily payment reports.

222.   Per 45 C.F.R. § 164.501, the business associate may only aggregate the PHI for the healthcare operations of the covered entity, not for the business associate's own purposes, such as is the case with the daily payment reports.

223.   Plaintiff reported June 4th 2021 to Dale Erickson that D.S. Erickson and Associates PLLC failed to prevent unauthorized access to ePHI, in violation of 45 C.F.R. § 164.502(a). Defendant continued allowing collectors to access a patient's diagnosis, physical ailment or injury, as well as treatments by not limiting access through proper controls related to accessing hospital's systems.

224.   June 4th, 2021 Plaintiff also reported to Dale Erickson that D.S. Erickson and associates had failed to secure physical papers and/or documents containing PHI within the office. This protected information indicates testing, conditions and/or diagnosis of patients. 45 C.F.R. § 164.310(a)(2)(ii) requires the implementation of policies and procedures to safeguard the facility and the equipment therein from

unauthorized physical access, tampering, and theft. Plaintiff reported that D.S. Erickson was in violation by not taking appropriate measures including but not limited to having unlocked file drawers, unsecured mailboxes, etc.

225.   June 4th, 2021 Plaintiff reported to Dale Erickson, D.S. Erickson's failure to encrypt Protected Healthcare Information in emails. 45 C.F.R. § 164.312(a)(2)(iv) under Technical Safeguards requires those handling PHI to implement a mechanism to encrypt and decrypt electronic protected health information. Not encrypting PHI documents increases likelihood of protected information being misdirected or intercepted by unintended recipients or hackers in transit or at rest, which Plaintiff also reported.

226.   June 4th, 2021 Plaintiff reported to Dale Erickson, D.S. Erickson's failure to encrypt Protected Healthcare Information, which is also a violation of the Technical Safeguards. 45 C.F.R. 164.312(e)(2)(ii) requires entities to implement a mechanism to encrypt electronic protected healthcare information whenever deemed appropriate.

227.   Plaintiff reported to Dale Erickson June 4th, 2021 the illegal retaliation that D.S. Erickson had engaged in to dissuade Plaintiff from reporting illegal acts. The retaliatory acts of the employer violate 45 C.F.R. § 160.316(c), which states: A covered entity or business associate may not threaten, intimidate, coerce, harass, discriminate against, or take any other retaliatory action against any individual or other

person for opposing any act or practice made unlawful by this subchapter, provided the individual or person has a good faith belief that the practice opposed is unlawful, and the manner of opposition is reasonable and does not involve a disclosure of protected health information in violation of subpart E of part 164 of this subchapter.

228.  Plaintiff reported to Dale Erickson June 4th, 2021 that D.S. Erickson and Associates was presenting fixed and fake audits to their healthcare clients to falsely demonstrate compliance, which is fraudulent. An audit is random in nature, however D.S. Erickson and Associates asked employees to "cherry-pick" the best demonstrations of compliance, which included meeting specific criteria to present as if they were always compliant with the law, which clearly was not the case. If the "audit" did not meet specific criteria to demonstrate compliance, it was not submitted.

229.  Erickson responded to the June 4, 2021 whistleblowing report by email on June 8th, 2021, only to indicate that Erickson disagreed with Plaintiff's report, that Erickson believed that Erickson firm was compliant with the law in all respects, and that Erickson had retained outside counsel to review the reports Plaintiff had made, as it relates to Erickson firm's policies and procedures. This response, in which Erickson denied all reports he had made, was the only time that he had heard back from Erickson.

230.  June 11th, 2021 Plaintiff reported to Dale Erickson what he believed was an illegal licensing issue. D.S. Erickson and Associates purchased only 20 software

licenses but had registered the software on 30 machines. Plaintiff was instructed to use a free "demo version" of the software to perform his job duties, despite the sensitive arena the firm operates in while handling Protected Healthcare Information, personal banking information, and other sensitive documents that require safeguarding. Plaintiff in good faith reported that he suspected this was an illegal violation of the Copyright Act, per the Business Software Alliance. Additionally, restricting Plaintiff's ability to work for several days was an act of retaliation to diminish Plaintiff's ability to make an income and create a pretextual reason to falsely fire him. He also reported other acts as well.

231.   Despite multiple reports by Adams, DS Erickson and Associates failed to implement safeguards to ensure confidentiality, integrity and availability of PHI to the Minimum Necessary, pursuant to HIPAA law. June 11th, 2021 Plaintiff again reported to Dale Erickson a violation of Minn. Stat. § 144.293, which is to prevent the release of or disclosure of health records. Plaintiff reported that D.S. Erickson is not a healthcare provider, nor is the collection of past due balances for the current treatment of patients. The information shared, related to patient's diagnosis, condition, testing, treatment and/or prognosis, which is not necessary information to collect a past due bill.

232.   A continuing problem was again reported by Plaintiff to Dale Erickson on June 11th, 2021, which was Defendant's failure to maintain and monitor PHI

access logs contrary to Technical Safeguards requirements at 45 C.F.R. § 164.312(a)(1). This standard requires the entity to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights as specified in § 164.308(a)(4). Plaintiff reported that employees were able to use each other's login information interchangeably in order to access PHI, record transactions in the computer system, and that Plaintiff was unable to create or maintain his own password as required. HIPAA requires that only those with granted credentials have access to information afforded by their credentials on a need-to-know basis.

233.   Plaintiff reported to Dale Erickson June 11th, 2021 the illegal retaliation that D.S. Erickson had engaged in to dissuade Plaintiff from reporting illegal acts. Erickson removed Plaintiff's ability to generate an income by restricting his ability to answer the office phone during business hours. Erickson also removed Plaintiff's new referrals, so that he would have less inventory, receive less compensation and further remove Plaintiff's opportunity to earn a living while simultaneously damaging his reputation with peers. The retaliatory acts of the employer violate 45 C.F.R. § 160.316(c), which states: A covered entity or business associate may not threaten, intimidate, coerce, harass, discriminate against, or take any other retaliatory action against any individual or other person for opposing any act or practice made unlawful

by this subchapter, provided the individual or person has a good faith belief that the practice opposed is unlawful, and the manner of opposition is reasonable and does not involve a disclosure of protected health information in violation of subpart E of part 164 of this subchapter.

234.   June 11th 2021, Plaintiff reported to Dale Erickson believed violations relating to Regulation E pursuant to the E-Sign Act. 12 C.F.R. § 205

235.   Plaintiff reported to Dale Erickson June 11th, 2021 the failure of D. S. Erickson and Associates PLLC to secure written consent for recurring payments, which violates 12 C.F.R. § 1005.10(b)

236.   Plaintiff reported to Dale Erickson June 11th, 2021 the failure of D. S. Erickson and Associates PLLC to provide a disclosure pertaining to how a customer may change or cancel a payment, which violates 12 C.F.R. § 1005.10(c)

237.   Plaintiff reported to Dale Erickson June 11th, 2021 the failure of D. S. Erickson and Associates PLLC failure to provide the customer a reminder letter prior to post-dated payments being deposited, which violates 12 C.F.R. § 1005.10(a)(1)

238.   In making the above reports, Plaintiff in good faith believed there were connected matters which are also illegal, such as 12 C.F.R. § 1005.10(d). When a preauthorized electronic fund transfer from the consumer's account will vary in amount from the previous transfer under the same authorization or from the preauthorized amount, the designated payee or the financial institution shall send the

consumer written notice of the amount and date of the transfer at least 10 days before the scheduled date of transfer, which is not done by Defendant.

239.  June 11th, 2021 Plaintiff reported to Dale Erickson the failure of D.S. Erickson and associates to state on every call to customers in California and Florida that the call is recorded (FDCPA violation for each).

240.  In Florida, it is a criminal offense to use any device to record communications, whether they're wire, oral or electronic, without the consent of everyone taking part in the communication per Fla. Stat. § 934.03(2)(d). This means that in Florida you are not legally allowed to record a conversation you are taking part in unless all parties are in agreement. Plaintiff in good faith suspected this law was violated by Defendant and reported it on June 11, 2021.

241.  California recording law stipulates that it is a two-party consent state per The California Invasion of Privacy Act (CIPA). In California, it is a criminal offense to use any device to record communications, whether they're wire, oral or electronic, without the consent of everyone taking part in the communication. This means that in California you are not legally allowed to record a conversation you are taking part in unless all parties are in agreement. California's law provides for $5,000 per violation in Penal Code 637.2. Plaintiff in good faith suspected this law was violated by Defendant and reported it on June 11, 2021.

242.  On June 25th, 2021, Plaintiff reported to Erickson there was a warning

in Fairview's computer system advising that patients must be reminded of the risks with non-encrypted emails and texts to be intercepted/accessed by others. This confirms yet another whistleblowing report, which Adams had made to Erickson on June 4th and again on June 11th, 2021, was also true and correct (attachment). Unfortunately, Erickson had not responded to this report either.

243.   June 25th, 2021 Plaintiff reported that customers should be allowed to dispute a debt so that their credit is not affected until validation of the debt can be provided. Not ensuring transparency of reporting is a violation of the Fair Credit Reporting Act, causing damage to the customers.

244.   August 3rd, 2021 Plaintiff sent Erickson a letter to summarize previous whistleblowing reports.

245.   Plaintiff also observed what he in good faith believed was a failure to act legally in handling customer disputes. When a customer disputes a bill to Erickson firm, Plaintiff believed it should not impact their credit until validation of the debt can be provided to the customer by law. For many of Erickson clients, Adams observed they were unable to acquire validation of the debt within a reasonable timeframe. Not alerting Erickson clients, so that the customer's credit report can denote such a dispute has taken place, Plaintiff in good faith believed was false and misleading and could have dire implications to a customer that is trying to clean up their credit.

246.   Plaintiff believed Erickson was obligated to ensure transparency under

the Fair Credit Reporting Act, as it relates to a dispute being properly documented, so that the customer isn't damaged as a result.

247.   Plaintiff in the summer of 2021 in good faith reported that Erickson's firm unjustifiably and illegally accessed Fairview's Epic system, which is not for the current treatment of the patient, nor is Erickson law firm a healthcare provider. This access allowed viewing of a plethora of very private information, which is not restricted. Some of the information that is made available to Erickson bill collectors included a picture of the customer. Even more troubling, are some of the most private and coveted information a person can possess, that is clearly not necessary to collect the bill. This information includes, but is not limited to the following: a customer's legal name, customer's preferred name, customer's date of birth, customer's social security number, customer's place of employment, customer's cell phone number, customer's work phone number, customer's home phone number, customer's emergency contact names and their respective phone numbers and respective relation to the customer, customer's marital status, customer's sex, customer's spouse's name, customer's spouse's place of employment and insurance information if the spouse holds the insurance policy. Additionally, the customer's minor dependents are also named as recipients of service, if they have been treated under the customer's profile. This information also includes the minor children's relation to patient, divulges if the minor is paternal, etc. Perhaps the most frightening violation of a customer's privacy

that is openly available to the bill collectors Erickson employ is knowledge of the customer's race and the customer's religion. If these egregious violations of a person's most coveted personal information were not enough to invoke concern or propel action by Erickson, his bill collectors, under Erickson direction, had the ability to edit the aforementioned Protected Healthcare Information at will.

248.   Plaintiff reported in the summer of 2021 in good faith what he believed was illegal including how intrusive and unnecessary this exposure of information is for those that are seeking medical treatment from the healthcare clients Erickson are tasked with representing (in adherence to law), information is also detailed which infers a customer's ability to pay and/or their respective financial status, by disclosing whether they are on Medical Assistance or Medicare. Having this unnecessary information available at will, provides bill collectors an unjust opportunity to profile and discriminate based on various ethnic and demographic information, which they should not have.

249.   At a firm meeting in 2018 Erickson had asked an employee that is still employed at the firm how they "vet" a customer for viability of payment. The employee responded that they look for a nice Caucasian, English sounding name, that they think will pay. Rather than setting the record straight on how inappropriate this racially charged mentality, racial profiling, and discriminatory practice is, Erickson chuckled. This is another testament to Erickson mantra of profit at any cost, even if

the practice breaks the law.

250.   Further, the company password, as well as Plaintiff's employee password to access Dacks software, did not ever change either, despite his whistleblowing report. Again, this is a security measure to reduce the risk of exposure of sensitive information, including PHI and personal banking information. Additionally, these passwords were not created by Plaintiff, but rather created by another employee under Erickson direction, and then relayed to Adams.

251.   Throughout working for Defendant, Plaintiff observed that it would not forthright acknowledge any attempts to correct any of the serious illegalities and/or malpractices that Plaintiff had reported despite the risk of continued retaliation at his own expense.

252.   Plaintiff observed that Erickson instead of correcting his illegal action instead attempted to dissuade Adams by retaliation from doing what is right by the public. In addition to retaliation against Plaintiff, Erickson tried to cover his tracks.

253.   One of Erickson's retaliatory measures was to insult and make the Plaintiff feel guilty for taking calls so that he would not be able to earn the living he had been promised earlier by Erickson. Because of Erickson's negative treatment the Plaintiff became increasingly anxious on the job. His telephone rang sometimes incessantly, especially during business hours of 9:00AM to 4:00PM, at which times Erickson stated reception was to be answering calls. Notwithstanding Erickson's

claims, the calls continued to ring through, further reminding Plaintiff of Erickson's derogatory pinch-shooting reference (an accusation meaning alleging that Plaintiff was stealing business) and of the retaliatory exception Erickson made of Adams not being able to answer the calls, even when it appeared they were going unanswered, or at least the callers were having to wait an inordinate time for their calls to be answered. Every time the phone rang, Plaintiff's heart palpitated, anxiety spiked, and he felt physically and emotionally ill,

254.   Knowing that the retaliation was only specific toward Plaintiff as a result of his whistleblowing, made his ability to work effectively very difficult, which further crippled Plaintiff's efforts of being able to earn an income. At the same time this retaliation against Plaintiff's ability to be effective at his job and earn an income increasingly and adversely impacted Plaintiff's physical, mental, and emotional health, which was the retaliatory intention of Dale Scott Erickson.

255.   Plaintiff's employment with Erickson was harmed by the on-going pretextual and retaliatory acts by Erickson by denying him privileges and rights of employment. Defendant made it intolerable for Plaintiff to continue to work for it resulting in Plaintiff's constructive termination.

256.   Erickson unlawfully retaliated against the Plaintiff as stated above. As a direct and proximate result of the wrongful retaliation Plaintiff has suffered injury, loss of wages and benefits, loss of raises, suffered a loss of reputation and standing in

his community, loss of promotions, loss of employment opportunities, future employability, loss of back pay, loss of interest on back pay, attorneys fees and costs as well as mental and emotional distress.

257.   Erickson's actions are the direct and proximate cause of damage to Plaintiff. Erickson's aforementioned wrongful acts in violation of law caused Plaintiff to suffer monetary damages and has caused him damages for mental and emotional distress. Defendant constructively terminated Plaintiff's employment by its actions. Plaintiff has been damaged by the defendants' violations in excess of $75,000.00.

### THIRD CAUSE OF ACTION

### DISCRIMINATION BASED UPON DISABILITY
### IN VIOLATION OF MINN. STAT. § 363A.08, *ET SEQ.*, AS AMENDED

258.   The foregoing is alleged and incorporated in this paragraph by reference as though fully set forth herein.

259.   The Plaintiff worked for Erickson who has fifteen or more employees.

260.   Erickson is involved in an industry affecting commerce.

261.   Plaintiff's disabilities of Ulcerative Colitis and Rheumatoid Arthritis and pre-diabetes are physical impairments that substantially limits one or more of his major life activities. A record of such impairment exists and Erickson knew about his disabilities. Plaintiff was qualified for his job and could perform the essential functions of the job either with or without reasonable accommodations. He could do his job very well, but Erickson discriminatorily used Adams's disabilities against him

in such a way as to negatively impact Adams's terms, conditions and privileges of employment.

262.   When the Plaintiff brought up his disabilities it was used against him and has been a source that Defendant used discriminatorily to mock and retaliate against Plaintiff.

263.   Defendant made it clear that no reasonable accommodation would be made by Defendant for the Plaintiff's disabilities, but instead used it as an instrument when needed to destroy Plaintiff's credibility and make him falsely look bad in a particular situations Adams's disabilities have been used against him by Dale Erickson. He knew that Plaintiff was good at his job and that he was qualified for the position he held and the work he was to do from 2017 to November of 2021, and that Plaintiff was able to perform its essential functions, with or without a reasonable accommodation.

264.   Despite knowing that the Plaintiff was qualified and able to do his job Defendants conduct in 2021 shows that he has been subjected to a negative job action based on disability. Other employees who did not have a disability were treated differently and better. If they had a question or concern they were not humiliated and/or penalized like the Plaintiff has been by Defendant.

265. Defendant knowing of the Plaintiff's disabilities acted in a discriminatory way in 2021 by using Plaintiff's known disabilities as a way to get

control over him so he would yield to his use to break the law. In his conversations with Plaintiff Dale Scott Erickson more than once made submission by Plaintiff to Defendants expecting him to break the law a condition of being able to maintain his status with Defendant.

266.   Scott Erickson based his decisions on Plaintiff's progress and status as an employee while working for Defendant on whether he accepted being discriminated against based upon his disabilities and allowed Defendant to do whatever he wanted to him. When Plaintiff reasonably resisted the Defendant's disability discrimination toward him it attempted to cover up its discriminatory and retaliatory acts. Defendant intentionally made it intolerable to Plaintiff to work for it so as to constructively terminate Plaintiff's employment.

267.   Defendant's aforementioned disability discrimination and related retaliation against Plaintiff was the direct and proximate cause of damage to him in excess of $75,000.

FOURTH CAUSE OF ACTION

PUNITIVE DAMAGES

268.   The foregoing paragraphs are re-alleged as set forth above and are incorporated herein by reference.

269.   Plaintiff has been the victim of willful, wanton conduct with malice directed at him by Defendant, which was known to cause him harm or should have

been known to permanently damage him and has resulted in damage warranting punitive damages. Attached hereto and incorporated herein by reference is the Declaration of Michael Adams setting forth information that is in addition to that which is set forth in this Amended Complaint.

270. Defendant D.S. Erickson had knowledge of the pattern and practice of misconduct in which it engaged, including the malicious discrimination, harassment and retaliation directed against Plaintiff for making whistleblowing reports of what he suspected were violations of law, specifically the FDCPA, the FCRA, HIPAA, 45 CFR 160.316, Minn. Stat. §181.932, et seq., and Minn. Stat. § 363A.08, et seq.

271. When Plaintiff began whistleblowing, Defendant immediately began retaliating against Defendant with malice using Plaintiff's disabilities as a focal point of Defendant's discrimination, harassment and retaliation.

272. Despite Plaintiff's whistleblowing reports, Defendant continued to target Plaintiff, with malice, damaging Plaintiff's ability to earn a living, creating an adverse work environment wherein Plaintiff was denied the same opportunities as his co-workers with respect to the assignment of collections files to Plaintiff, false accusations that Plaintiff was stealing collections files, denial of Plaintiff's requests for reasonable accommodations to allow him to continue to work from home during the COVID-19 pandemic, demanding that Plaintiff return to work when it is not safe for him to do so, and causing Plaintiff harm through exacerbation of Plaintiff's

disabilities due to unwarranted workplace stress, causing mental and physical harm to him.

273.   Even after the Plaintiff made clear the dangerous situation presented at the workplace due to COVID-19, Defendant with malice failed and refused to require social distancing and masking requirements in the workplace, the absence of which was needless, callous and with malice completely disregarded Plaintiff's health and safety. Defendant penalized him with malice by requiring him to work in a place that endangered his health.

274.   The Defendant's unwarranted and unjustified work related stress directed with malice toward Plaintiff, needlessly caused him metal and emotional harm as well as physical harm by exacerbating his underlying medical disabilities of ulcerative colitis and rheumatoid arthritis.

275.   As a result of the Defendant's unwarranted and unjustified work related stress directed with malice toward Plaintiff, his ulcerative colitis, which had been manageable before Defendant's malicious actions, flared up and caused the following, including but not limited to, inflammation of his pouch which significantly increased Plaintiff's need to use the bathroom, cramping, urgency, blood in his stool, loss of sleep, leakage of fluid from the pouch through his rectum, fecal incontinence, significantly increased anxiety, loss of appetite, loss of enjoyment of life, increased depression, may result in the need for surgery to remove

the pouch and the placement of a stoma for use with a colostomy bag, increased inflammation, formation of numerous ulcers, and chronic fatigue.

276.  As a further result of the unwarranted and unjustified work related stress directed with malice toward Plaintiff, his rheumatoid arthritis has also been exacerbated resulting insignificantly increased bodily aches and pain, decreased mobility, swelling of joints, pain with walking, pain with sitting, soreness, stiffness, loss of sleep, loss of appetite, insomnia due to the pain and discomfort in his joints, chronic headaches, and generalized pain that diminishes Plaintiff's enjoyment of life.

277.  Defendant's acts were intentionally done with malice, oppressive or in reckless disregard of Plaintiff's rights. There was a high degree of degree of reprehensibility of Defendant's misconduct egregiously directed toward Plaintiff in retaliation for his whistleblowing reports regarding Defendant's violations of consumer protection laws such as the FDCPA, FCRA, HIPAA, and 45 CFR 160.316, which created a substantial risk of harm to the general public, and so was particularly reprehensible.

278.  Defendant showed a deliberate disregard for the Plaintiff's welfare.

279.  Defendant knew about facts and/or intentionally ignored facts that created a high probability of injury to the rights and safety of Plaintiff and others.

280.  Defendant malicious actions were foreseeable to be a serious hazard to

the Plaintiff and the public that were caused by Defendant conduct.

281.   Defendant profited by its misconduct through the collection of debt that was not owed, was not properly verified, and other illegal and acts that they falsely, intentionally causing harm to patient/debtors' whose debts they collected and/or sued for collection.

282.   As a result of the Defendant's intentional with malice willful, wanton conduct with callous disregard for the Plaintiff he has been severely damaged well in excess of $75,000 and is entitled to punitive damages from Defendant.

WHEREFORE, Plaintiff prays for the following relief:

A.   Awarding Plaintiff a judgment against Defendant for all damages recoverable as a result of Defendant's discrimination and retaliation in violation of the Americans with Disabilities Act (ADA) 42 U.S.C. § 12101, *et seq*, as amended.

B.   Awarding Plaintiff a judgment against Defendant pursuant to Minn. Stat. § 181.932, *et seq.*, as amended, for all damages recoverable for Defendant's retaliation against Plaintiff for his whistleblowing.

C.   Awarding Plaintiff a judgment against Defendant for all damages recoverable for Defendant's discrimination against Plaintiff in violation of the Minnesota Human Rights Act. § 363A.08, *et seq.*, as amended.

D.   Granting Plaintiff punitive and exemplary damages in an amount to be determined by the Court for Defendant's intentional and with malice willful and

wanton violation of Plaintiff's protected rights as a whistleblower under Federal and State law that the Court deems necessary to deter such conduct as engaged in by Defendant.

E.      Awarding monetary damages, liquidated damages, consequential damages, costs and attorney's fees to be paid by Defendant to Plaintiff.

F.      Granting such other relief as may be just, with costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues triable by jury.

Dated: July 7, 2022                    Neff Law Firm, P.A.

                                       */s/Fred L. Neff*
                                       Fred L. Neff, Atty. Reg. # 0077355
                                       One Corporate Plaza, Ste. 165
                                       7400 Metro Boulevard
                                       Edina, MN 55439
                                       Telephone: (952) 831-6555
                                       Facsimile: (952) 831-2711 Email:
                                       info@neff-law-firm.com

                                       *Attorney for Michael Adams*

### ACKNOWLEDGMENT

The undersigned hereby acknowledges that pursuant to Fed.R.Civ.P. Rule 11 and Minn. Stat. §549.211, the Court may impose sanctions if it finds a violation of these sections.

Dated: July 7, 2022                    Neff Law Firm, P.A.

                                       */s/Fred L. Neff*

Fred L. Neff, Atty. Reg. # 0077355
One Corporate Plaza, Ste. 165
7400 Metro Boulevard
Edina, MN 55439
Telephone: (952) 831-6555
Facsimile: (952) 831-2711 Email:
info@neff-law-firm.com

*Attorney for Michael Adams*

ACKNOWLEDGEMENT

I, Michael Adams, have read the foregoing Second Amended Complaint and under the pains and penalties of perjury hereby state that to the best of my knowledge and belief the information, and the factual statements therein are true and correct.

Dated: _____        _____
                                        Michael Adams